UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JACINTO PENA,

                       Petitioner,                  Case No. 1:11-cv-450

v.                                     Honorable Gordon J. Quist

JOHN PRELESNIK,

                       Respondent.

_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is incarcerated pursuant to his conviction in the Kent County Circuit Court for first-degree murder, MICH. COMP. LAWS § 750.316(a)-(b), and mutilation of a dead body, MICH. COMP. LAWS § 750.160.[1] He was sentenced as an habitual offender, MICH. COMP. LAWS § 769.10, to life imprisonment for the murder conviction and five to fifteen years for the mutilation conviction.

      In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

I.      MICHIGAN'S FELONY MURDER RULE REQUIRES ADDITIONAL MENS REA BESIDES INTENT TO COMMIT THE UNDERLYING FELONY. THERE WAS INSUFFICIENT EVIDENCE THAT DEFENDANT POSSESSED THE REQUIRED STATE OF MIND FOR A CONVICTION.

II.     THERE WAS INSUFFICIENT EVIDENCE ON THE MUTILATION CHARGE. DEFENDANT WAS CONVICTED WITHOUT PROOF OF AN ESSENTIAL ELEMENT, IN VIOLATION OF HIS DUE PROCESS RIGHTS.

---

[1] Petitioner originally was convicted by a jury of both first-degree premeditated murder and first-degree felony murder, as well as first-degree criminal sexual conduct. The Michigan Court of Appeals later vacated the CSC conviction on double-jeopardy grounds and modified the judgment to reflect a single conviction for first-degree murder, supported by two different theories. (*See* MCOA Op. 5, docket #26.)

III. DEFENDANT'S TWO ADMISSIONS WHERE ILLEGALLY OBTAINED BOTH BECAUSE HE WAS NEVER ADVISED OF HIS RIGHT TO COURT APPOINTED COUNSEL AND BECAUSE THE TOTALITY OF THE CIRCUMSTANCES RENDERED HIS STATEMENT INVOLUNTARY.

IV. DEFENDANT'S 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WAS VIOLATED.

    A. DEFENDANT'S 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WAS VIOLATED BY HIS TRIAL ATTORNEY'S DEFICIENT AND PREJUDICIAL PERFORMANCE AT THE *WALKER* HEARING.

    B. DEFENDANT'S 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY HIS TRIAL COUNSEL'S FAILURE TO CHALLENGE THE CREDIBILITY OF DEFENDANT'S INCRIMINATING STATEMENTS TO POLICE DUE TO BEING PROMISED LENIENCY.

V. DEFENDANT'S 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED.

Respondent has filed an answer to the petition (docket #11) stating that the grounds should be denied. Petitioner filed a response (docket #39). Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

## **Procedural History**

### A. Trial Court Proceedings

The state prosecution arose from the rape and murder of Leslie Mateo in Grand Rapids on September 24, 2005. Petitioner was tried before a jury beginning on October 5, 2006, and concluding on October 19, 2006.[2]

---

[2]The trial transcripts will be referred to as follows:
Tr. I     - Jury Trial Volume I, October 5, 2006 (docket #16)
Tr. II    - Jury Trial Volume II, October 6, 2006 (docket #17)
Tr. III    - Jury Trial Volume III, October 9, 2006 (docket #18)

Grand Rapids Police Officer Robert Zabriskie testified that Petitioner came to the Grand Rapids Police Department with his mother and girlfriend on the evening of September 25, 2005. (Tr. III, 22-24.) Petitioner told Zabriskie that he was there to turn himself in because he had murdered somebody. (Tr. III, 24.) Zabriskie was surprised by Petitioner's statements and asked him who he murdered and where the body was located. Petitioner responded that he did not know the girl's name, but her body was at his house at 32 Stewart. (Tr. III, 25-26.) Zabriskie relayed the information about the victim to other officers and advised Petitioner of his *Miranda* rights. (Tr. III, 26-27.) Petitioner stated that he understood his rights and agreed to talk to Zabriskie. (Tr. III, 27-28.) Petitioner seemed nervous and sorrowful, but did not appear drunk or high. (Tr. III, 29-31, 54.) During the interview, Petitioner told Zabriskie that the victim was Puerto Rican and had come over to his house with some friends after the bar closed. (Tr. III, 52.) Petitioner stated that he strangled the victim with his hands and then put her blouse around her neck. (Tr. III, 35, 51.) Petitioner also admitted that he raped the victim. (Tr. III, 36.) Petitioner told Zabriskie that he put the victim's body in the bath tub. When Petitioner woke up the next day, he realized that he had killed her. (Tr. III, 54-55.) Petitioner claimed that he had consumed at least a 24-pack of beer and some cocaine before the murder occurred. (Tr. III, 54.)

Zabriskie testified that he did not record his conversation with Petitioner, but took notes of Petitioner's statements in question and answer format, writing down Petitioner's answers verbatim. (Tr. III, 38, 44, 48-50.) Zabriskie used his notes to write a report within the hour. (Tr. III,

---

Tr. IV    - Jury Trial Volume IV, October 10, 2006 (docket #19)
Tr. V    - Jury Trial Volume V, October 11, 2006 (docket #20)
Tr. VI    - Jury Trial Volume VI, October 16. 2006 (docket #21)
Tr. VII   - Jury Trial Volume VII, October 17, 2006 (docket #22)
Tr. VIII - Jury Trial Volume VIII, October 18, 2006 (docket #23)
Tr. IX  - Jury Trial Volume IX, October 19, 2006 (docket #24)

37-40, 50.)  After interviewing Petitioner, Zabriskie escorted Petitioner to an interview room in the detective unit and stayed with him until Detectives Jorgensen and DeVries arrived. (Tr. III, 33, 44.) As a road officer, Zabriskie did not have the authority to use the interview room and did not know how to operate the audio recording equipment in the room.  (Tr. III, 45-46.)  While he was with Petitioner, Zabriskie never threatened Petitioner or made any promises in exchange for his statements.  (Tr. III, 34.)

Grand Rapids Firefighter Joaquin Martinez testified that he and two other firefighters were dispatched to 32 Stewart at 7:26 p.m. on September 25, 2005, for a possible DOA (Dead on Arrival).  (Tr. III, 59-60.)  After surveying the house, the firefighters decided to kick in the back door.  (Tr. III, 61.)  The firefighters found the victim upstairs in the bathtub.  (Tr. III, 62-63.) Martinez checked for the victim's pulse and determined that she was dead.  (Tr. III, 63.)  Martinez believed that the victim had been dead for several hours because her arm was stiff.  (Tr. III, 64.)  The victim was wearing a skirt, but was bare from the waist up, except for a piece of cloth wrapped around her neck.  (Tr. III, 65.)  There was blood smeared all around the bathroom floor, as well as a trickle of blood in the bath tub.  (Tr. III, 65-66.)  Martinez backed out of the bathroom in order to preserve the scene for police officers.  (Tr. III, 64.)  While he was walking around the outside of the house, Martinez noticed that one of the upstairs windows was partially broken out.  (Tr. III, 65, 73.)

Grand Rapids Police Detective James Jorgensen testified that he and Detective DeVries interviewed Petitioner on the evening of September 25, after he gave an initial statement to Sergeant Zabriskie.  (Tr. III, 84.)  Jorgensen advised Petitioner of his rights near the beginning of the recorded interview.  (Tr. III, 85.)  Jorgensen testified that he and Detective DeVries did not immediately advise Petitioner of his *Miranda* rights because Officer Zabriskie already had read him

his rights.  (Tr. IV. 45.)  While not required to advise him of his rights a second time, the detectives wanted to confirm that he understood his rights and get it on tape.  (Tr. IV, 16-17, 45-46.)  According to Jorgensen, Petitioner was calm and seemed a bit depressed.  (Tr. III, 86.)  There was no indication that Petitioner was under the influence of drugs or alcohol.  (Tr. III, 87.)  Neither of the detectives promised to be lenient with Petitioner if he gave a statement.  (Tr. III, 89, 93.)   Jorgensen and DeVries recorded their interview with Petitioner, which was played for the jury.  (Tr. III, 89.)  The jury was provided with a transcript of the interview. (9/26/05 Police Interview, docket #30.)

Petitioner told the detectives that he was out drinking at Yester Years bar the night before.  Petitioner arrived at the bar around 5:00 p.m. and drank a pitcher of beer.  (Police Interview, 1, 16-17.)  He planned to sell some cocaine to make some money.  (Police Interview, 17.)  He sold one (1) eight ball and then left to buy more cocaine.  (Police Interview, 17.)  He went back to the bar around 9:00 p.m. and sold another eight ball.  (Police Interview, 1, 3, 18.)  Sometime later, he met the victim and her mother at the bar and the three of them sat around drinking pitchers of beer.  (Police Interview, 1, 18.)  Petitioner's friend, George, showed up at the bar and joined them.  (Police Interview, 19.)  Over several hours at the bar, Petitioner drank about seven pitchers of beer and snorted two (2) eight balls of cocaine.  (Police Interview, 1, 4-5.)  Petitioner and George invited the women back to Petitioner's house.  (Police Interview, 19.)  The victim and her mother did a couple of lines of cocaine at Petitioner's house and then left.  (Police Interview, 1, 5, 19, 21.)  Petitioner bought another 24-pack of beer to drink at home and ended up drinking about twelve of them. (Police Interview, 1, 4.)

Petitioner told the Detectives that the victim came back to his house with a friend, who ultimately left with George.  (Police Interview, 1, 5, 19, 22-23.)  Petitioner and the victim talked

and did more coke.  (Police Interview, 23-24.)  The victim went up to the bedroom with Petitioner and took off her shirt, but she stopped and refused to have sex with Petitioner, so he forced her.  (Police Interview, 1, 5, 8.)  Petitioner grabbed the victim by the arms, forced her down to the floor (or the air mattress on the floor) and ripped off her panties.  (Police Interview, 9-10.)  Petitioner continued, "I ripped off her panties and the idea was to speed up, I raped her basically but I don't remember if I had sex with her.  I don't, I don't even remember what we talked about or anything.  It's just I'm trying to piece the story in to myself to [sic]."  (Police Interview, 10.)  The victim started screaming for help and kicked through the bedroom window.   (Police Interview, 2, 25-26.)  Petitioner appeared to have scratches and bite marks on his body that he believed were caused by the victim trying to defend herself.  (Police Interview, 12.)  Petitioner choked her with his hands and then took her shirt and wrapped it around her neck and choked her with the shirt.  (Police Interview, 15.)  After she was dead, Petitioner took her to the bathroom and shoved his hand into her "pussy."  (Police Interview, 6, 10.)  That caused her to bleed, so he put her in the bathtub.  (Police Interview, 10.)  Petitioner repeatedly stated that he never meant to do anything like that.  (Police Interview, 7.)  Petitioner went back downstairs and fell asleep on the couch.  (Police Interview, 2.)  When he awoke the next day, he could barely remember what had happened the night before, but he saw the victims' jacket and shoes on the floor and suddenly realized what he had done.  (Police Interview, 5, 8.).  Petitioner went over to his parent's house and told them that he had raped and killed a young girl.  (Police Interview, 14.)  Petitioner could not remember the victim's name, but he remembered that he knew her brother, Oscar Mateo.  (Police Interview, 31.)

Detective Jorgensen testified that Petitioner had what looked like bite marks on the front of both shoulders.  (Tr. III, 98-99.)  He also had scratches on his face, neck and arms.  (Tr. III,

100-101; Tr. IV, 38-39.) Petitioner stated that he had not showered and still was wearing the same clothes as the night before. (Tr. IV, 39.) After the interview with Petitioner, Jorgensen went to inspect the crime scene and found it to be entirely consistent with Petitioner's story. (Tr. III, 104.)

Maria Pena, Petitioner's mother, testified that Petitioner came to her house on Sunday and told her that he found a dead body in his house. (Tr. IV, 60.) Mrs. Pena told him to tell the police so they could investigate. (Tr. IV, 60, 69-70.) While Petitioner was at her house, Mrs. Pena saw him in the bathroom inhaling a white powder. (Tr. IV, 71-72.) Mrs. Pena and Danielle, Petitioner's ex-girlfriend, went to the police station with Petitioner. (Tr. IV, 62.)

Danielle Fischer, Petitioner's ex-girlfriend, testified that she and Petitioner began dating in May 2005, and she later moved in with him at 32 Stewart Street. (Tr. IV, 77-78.) Fischer moved out a few days before the victim's death. (Tr. IV, 78.) Petitioner called Fischer at about 6:00 p.m. on September 25 and asked her to come over to his mother's house because there was an emergency. (Tr. IV, 79-80.) When Fischer arrived, Petitioner and his parents were very upset. (Tr. IV, 80-81.) Petitioner told Fischer that he thought he hurt someone and she was at his apartment. (Tr. IV, 81.) When Fischer asked him what happened, he said that he didn't know. (Tr. IV, 98.) Fischer did not remember Petitioner saying that he raped or killed someone. (Tr. IV, 81.) Petitioner did not smell like alcohol, but Fischer could tell that he had been drinking because his eyes were glassy. (Tr. IV, 83.) Fischer went to the police station with Petitioner and his mother, but she did not hear what Petitioner told the officer because she stayed in a waiting area. (Tr. IV, 84.) Fischer was interviewed by Detective McGee on the night of Petitioner's arrest and admitted to telling McGee that Petitioner told her that he picked up a girl at a bar, went to his house and started to have sex. Fischer also reluctantly admitted to telling McGee that Petitioner stated that the girl wanted to

stop, so he choked her.  (Tr. IV, 86, 92-93.)  During an interview with police several months later, Fischer claimed that Petitioner told her that he found the victim's body in the bathtub and did not know what had happened.  (Tr. IV, 89.)  She also told the officers for the first time that Petitioner woke up with a bump on his head.  (Tr. IV, 90, 96-97, 121.)  Fischer had visited Petitioner about twenty times since his arrest.  (Tr. IV, 113.)  During those visits, Petitioner told her that he did not rape or kill the victim and that it had to be somebody else.  (Tr. IV, 114.)

Grand Rapids Police Officer Richard Atha testified that he was dispatched to 32 Stewart at 7:26 p.m. on September 25.  Atha was instructed to check the residence for a homicide victim and that the suspect was in custody.  (Tr. IV, 125.)  Atha was the first police officer on the scene.  (Tr. IV, 127.)  The front door was open and fire department personnel already were inside the house and reported that there was a dead body in the bathroom.  (Tr. IV, 129-30.)  Atha went upstairs and observed blood on the bathroom floor.  He also saw a Hispanic female lying in the tub.  She was wearing a denim miniskirt and had an article of clothing around her neck.  (Tr. IV, 131.)  Atha also went to Yester Years bar to interview employees who were working the previous night.  (Tr. IV, 134.)  Atha spoke to Cassandra, who remembered Lydia and her daughter coming in that night.  Cassandra told Atha that Lydia's daughter was wearing a denim miniskirt and a floral print top.  (Tr. IV, 135.)  After further investigation, Atha and Captain VanderKooi located Lydia Torres at her home on Oakland.  (Tr. IV, 138.)  Lydia told them that she and her daughter, Leslie Mateo, went to Yester Years bar the night before.  (Tr. IV, 138.)  They left the bar at 11:30 p.m. and stopped briefly at a house on Stewart.  (Tr. IV, 138.)  After that, they went to a house on the northeast side.  A little while later, Leslie left with a neighbor.  (Tr. IV, 138.)

Grand Rapids Police Department crime scene technicians Karen Curtiss and Ibo Brian Reed testified that they processed and collected evidence at the crime scene. (Tr. IV, 143; Tr. V, 24-25.) In the living room, there was a jacket, a pair of women's sandals, an earring, a hair clip and an article of underclothing. (Tr. IV, 147; Tr. V, 40, 98-99.) The jacket pocket contained some keys and a Sprint phone. (Tr. V, 99.) An earring matching the one found in the living room was discovered in the dining room. (Tr. IV, 147; Tr. V, 45, 50-51.) In the kitchen, there were small scales, bags containing a white powdery material, baggies and other items typically related to drug activity. (Tr. V, 53-55.) There also was a box of shotgun shells on top of the refrigerator. (Tr. V, 56.) The technicians did not observe any blood on the first floor of the house. (Tr. IV, 148.)

In the south bedroom on the second floor, there were brown stains on the floor that appeared to be fecal matter, and a condom was found under the air mattress. (Tr. IV, 149; Tr. V, 60, 64.) There also were reddish stains that appeared to be blood on the underside of the air mattress. (Tr. V, 60, 67.) The technicians collected a torn pair of panties and bra from the bedroom floor. (Tr. IV, 149; Tr. V, 60, 65.) They also seized a Mossberg 410 shotgun that was standing in the corner of the room. (Tr. IV, 149.) The technicians further testified that the bedroom window was broken. (Tr. V, 61.)

In the bathroom on the second floor, there was a Hispanic woman in the bathtub with something around her neck that looked like a shirt. (Tr. IV, 149-50.) There was a brown stain on the floor between the sink and the toilet and a large brownish-red stain in the middle of the floor that appeared to be fecal and blood stains. (Tr. IV, 149; Tr. V, 84-85.) There also was a pink condom in the toilet. (Tr. V, 86.) The garbage can contained three or four condoms, condom wrappers, stained tissues and a syringe. (Tr. V, 86-87.) The victim appeared to have some bruising and

abrasions on the right side of her face and her lips had blood on them. (Tr. V, 88-89.) She also appeared to have some bruising on her upper body and left arm. (Tr. V, 89.) The victim also had a cloth wrapped around her neck. (Tr. V, 89-90.) Reed also tested several items for finger prints, but could not find any usable prints. (Tr. V, 138-39.)

Cassandra Lynn Vandam testified that she worked as a bartender at Yester Years on September 24 and 25, 2005. (Tr. V, 11.) Vandam saw the victim and her mother at the bar on the night of Saturday, September 24. (Tr. V, 12.) Vandam did not know the victim's name, but knew her mother's name was Lydia. (*Id.*) The victim was wearing a short skirt and blouse. (Tr. V, 13.) The women ordered drinks at the bar and then sat down at a table. (Tr. V, 13.) Sometime later, the victim and Petitioner came up to the bar together to order drinks. (Tr. V, 14.) Vandam testified that they were laughing and seemed to be having a good time. (Tr. V, 15.) Vandam did not see either of them leave the bar. (Tr. V, 22.) Between 11:00 and 11:30 p.m., the victim's wallet was found in the area of the bar where she had been sitting. (Tr. V, 17.) Vandam knew George Martinez, but did not specifically recall whether she saw him that night. (Tr. V, 21.)

Lara Ballard testified that she met Leslie Mateo at a neighbor's house at about 1:00 a.m. on September 25, 2005. (Tr. V, 106-07.) Leslie's mother and other relatives also were there. After Leslie's mother left, Leslie told Ballard that they could go get some cocaine from friends of hers. (Tr. V, 108.) Ballard drove Leslie to a house on Stewart just before 2:00 a.m. (Tr. V, 108.) Petitioner answered the door carrying a double-barreled shotgun. (Tr. V, 109-10.) A guy who introduced himself as "Chris" was the only other person at the house. (Tr. V, 110, 123.) At the time of trial, Ballard learned that Chris actually was George Martinez. (Tr. V, 123.) Petitioner and George told the girls that some black guys had ripped them off and they were waiting for them to

come back. (Tr. V, 110-11.) No one else came to the house while Ballard was there. (Tr. V, 111.) After they arrived, Ballard and Leslie were in the upstairs bathroom for at least fifteen minutes. (Tr. V, 114, 124-27.) Petitioner ran out of drugs, so he gave George some money, and George and Ballard left in her car to go buy some crack. (Tr. V, 112-13.) Ballard and George went to her house to use some of the crack. (Tr. V, 113.) Ballard wanted to go get Leslie, so they left her house and drove back to Stewart Street. About forty-five minutes to an hour had passed since they had left Petitioner's house. (Tr. V, 114, 116.) George pointed out Petitioner's house and then asked to be dropped off down the street. (Tr. V, 113-14.) When Ballard went back, she could not find Petitioner's house because she did not know the address and all of the houses looked the same. (Tr. V, 113-14, 131-32.)

Juana Ruiz, the victim's aunt, testified that the police came to her door on September 25, 2005. (Tr. VI, 6.) The police told her that someone had been hurt very badly and asked her if she knew where to find Lydia, who was Ruiz' sister. Ruiz called Lydia at their mother's house and put the police on the line with her. (Tr. VI, 8.) Lydia was worried that something had happened to Leslie because she had not come home the night before. (Tr. VI, 7.)

Kate Dozeman, a forensic scientist with the Michigan State Police, testified as an expert in the area of serology. (Tr. VI, 15.) Dozeman examined vaginal, rectal and oral swabs taken from the victim and did not detect the presence of seminal fluid. (Tr. VI, 17-21.) According to Dozema, the initial chemical test on the swabs is for a chemical found in seminal fluid that degrades before the sperm cells. (Tr. VI, 21.) Dozema then created smears from the swabs and examined them under the microscope. She discovered sperm cells in the vaginal smears. (Tr. VI, 21-22) Dozema sent the vaginal swab used to create the smear for DNA analysis. (*Id.*) Dozema took swabs

of nail scrapings from the victim for DNA testing. (Tr. VI, 23.) Dozema also tested a green condom for the presence of seminal fluid, but the test was negative. (Tr. VI, 23-24.)

Jody Hrabal testified as an expert in the area of forensic DNA analysis. (Tr. VI, 33.) Hrabal received cuttings from a vaginal swab, swabs from the victim's neck, a blood card cutting for the victim and a buccal swab from Petitioner. (Tr. VI, 38.) The tests on the vaginal and neck swabs matched the victim. (Tr. VI, 40-41.) No other DNA profiles were detected. (*Id.*)

Sara Thibault also testified as an expert in DNA analysis. Thibault tested the swabs taken of the finger nail scrapings and swabs taken from the inside and outside of a condom. (Tr. VI, 51.) The DNA profiling from the nail scrapings did not produce results that could be used to make a DNA comparison. (Tr. VI, 53.) With regard to the inside of the condom, the major donor was an unidentified male and Petitioner could not be excluded as a minor donor. (Tr. VI, 55-57, 59.) Thibault was unable to develop a DNA profile for the outside of the condom due to a lack of or degradation of genetic material. (Tr. VI, 57.) Had the condom been inside a woman's vagina within 24 hours of the swab being taken, Thibault would have expected to find some genetic material from the woman on the outside of the condom. (Tr. VI, 58.)

George Martinez testified that he had hung out with Petitioner a couple of times before September 24, 2005. (Tr. VI, 71.) On the night of September 24, Martinez first saw Petitioner at Yester Years bar. Petitioner was with two women -- Lydia and her daughter, Leslie. (Tr. VI, 72-73.) The four of them left the bar together and drove to Martinez' house to retrieve his cell phone. After that, they drove to a friend of Martinez' house to get some cocaine. (Tr. VI, 75.) They then proceeded to buy some beer and went to Petitioner's house. (*Id.*) All four of them drank beer and snorted some coke. (Tr. VI, 75-77.) The women left and Martinez and Petitioner continued

to drink beer and played around with Petitioner's shotgun. Petitioner tried to load the gun, but was unsuccessful because the bullets were the wrong size. (Tr. VI, 77-78.) Sometime after Lydia and Leslie left, Petitioner started pacing around and got upset because he was supposed to sell some of his dope, but he had used it up with them. (Tr. VI, 84.) Petitioner punched a wall. (*Id*.) The two men tried to go back to Yester Years, but the bar was closed. (Tr. VI, 79.) They walked up to Griggs Street and talked to some black guys about buying some coke. Martinez did not recall whether there was any conflict between Petitioner and those men. (Tr. VI, 92-93.) After that encounter, Petitioner and Martinez walked back to Petitioner's house. (Tr. VI, 79.)

Later that night, Leslie and another girl came back to Petitioner's house. (Tr. VI, 78.) Martinez told the new girl that his name was "Chris" because she said her name was "Lisa," which was false.[3] (Tr. VI, 81.) Petitioner gave Martinez money to get more cocaine. Martinez and Ballard left together in her Jeep to get more coke, leaving Petitioner and Leslie at the house. (Tr. VI, 81-82, 101.) Martinez testified that he and Ballard bought some cocaine and crack. (Tr. VI, 97-98.) Ballard wanted to go back to Petitioner's house to get Leslie, but Martinez did not want to go back because he had not gotten the type or amount of drugs that Petitioner had requested. (Tr. VI, 101.) Consequently, Ballard left Martinez at a friend's house on Palace Street while she tried to find Petitioner's house. (Tr. VI, 99-100.) Ballard could not find the house and went back for Martinez. They went to Ballard's house and used some of the drugs. After another unsuccessful attempt to find Petitioner's house, they returned to Ballard's apartment and spent the night. (Tr. VI, 82-85, 98.) About a month earlier, Petitioner and Martinez met some girls on the street near Petitioner's house

---

[3]It was undisputed at trial that the girl with the victim who introduced herself to Martinez as "Lisa" was, in fact, Lara Ballard.

and Martinez had sex with one of them in the upstairs bedroom at Petitioner's house with a mattress on the floor. (Tr. VI, 86-87.) Martinez used a condom. (Tr. VI, 87.)

Detective Sergeant Terry McGee of the Grand Rapids Police Department testified that he interviewed Petitioner's mother and girlfriend at the police station on September 25. (Tr. VI, 105.) Danielle Fischer, Petitioner's ex-girlfriend, told McGee that Petitioner called her and said that he had done "a really bad thing" and was "going to go away to prison for a long, long time." (Tr. VI, 106.) When Fischer arrived at Petitioner's mother's house, Petitioner told Fischer that he had picked-up a woman at a bar and took her home. They were going to have sex and she wanted to stop, so he "ended up choking her and killing her." (*Id.*) Petitioner also told Fischer that the victim kicked out a window just before he started choking her. (Tr. VI, 108.) Petitioner's mother, Mrs. Pena, stated that when she got home from church on Sunday, Petitioner told her, "I think I murdered a girl." (Tr. VI, 107, 112.) McGee did not record his interviews with Danielle Fischer and Mrs. Pena. (Tr. VI, 108.) In McGee's police report, which was written on September 26, McGee wrote that Fischer told him that Petitioner reported choking the victim, but did not say that he had killed her. (Tr. IV, 110-11.) McGee testified that he could not recall ever speaking to Petitioner in connection with the case. (Tr. VI, 111.)

Daryl Clemens, a crime scene technician for the Grand Rapids Police Department, testified that he photographed and collected evidence from Petitioner at the police station on September 26. (Tr. VII, 12.) Clemens photographed Petitioner's injuries, which included what appeared to be bite marks on both shoulders and the back of one hand, and scratches on his neck and temple. (Tr. VII, 12-13, 17.) Clemens also collected Petitioner's clothing and took swabs from the

inside of his cheek, the bite marks on his shoulders and the backs of his hands for purposes of DNA analysis. (Tr. VII, 13, 20.)

Lydia Torres, the victim's mother, testified that she last saw Leslie on September 24, 2005. At that time, Leslie was living on Palace Street with her boyfriend, Pedro. (Tr. VII, 42-43.) On the night of September 24, Leslie was wearing a blue denim skirt, a brown floral top and brown shoes that belonged to Torres. (Tr. VII, 27.) Mrs. Torres identified the clothing, underclothing and jewelry that Leslie was wearing that night, as well as the cell phone and keys that were found in her jacket. (Tr. VII, 27-34.) Mrs. Torres testified that she and Leslie went to Yester Years bar on September 24 around 8:30 p.m. (Tr. VII, 35.) Petitioner was at the bar when they arrived. (Tr. VII, 35-36.) Leslie recognized Petitioner because he had dated her cousin, Emily. (Tr. VII, 36.) Petitioner bought them some beer and they sat down together. Petitioner snorted cocaine at the table and offered some to Torres and Leslie. The women used the cocaine in the bathroom. (Tr. VII, 37, 46.) After Mrs. Torres and Leslie returned to the table, Leslie danced with Petitioner and Torres danced with her friend, Lewis. (Tr. VII, 37.) When they were back at the table, George Martinez joined them. Torres had known Martinez for twenty years. Petitioner asked Leslie if she would give Martinez and him a ride to his house to get his phone. (*Id*.) After stopping to get Martinez' phone and to buy beer, they went to Petitioner's house. (Tr. VII, 37-38.) Torres testified that they were at Petitioner's house for about fifteen minutes. (Tr. VII, 48.)

Torres testified that she and Leslie left Petitioner's house around midnight and went to Torres' son's house. (Tr. VII, 38.) When Torres went to bed around 1:25 a.m., Leslie was outside with family members, friends and neighbors. (Tr. VII, 39, 51-52.) The next morning, Leslie's car was parked outside, but Torres could not find Leslie at the house. (Tr. VII, 39.) The neighbors told

Torres that Leslie had left around 2:45 or 3:00 a.m. with a girl named Ballard.  (*Id.*)  Torres spoke

to her sister, Juana, later that day and expressed concern about Leslie.  Later that evening, Juana

called Torres to tell her that the police were at her home and something had happened to Leslie.  (Tr.

VII, 40.)  The police came to interview Torres and she learned hours later that her daughter was

dead.  (Tr. VII, 40-41.)  Leslie did not have any injuries when Torres last saw her.  (Tr. VII, 41.)

      Detective Timothy DeVries of the Grand Rapids Police Department testified that he

interviewed Petitioner with Detective Jorgensen.  (Tr. VII, 62, 70.)  DeVries also went out to record

interviews with Fischer and Mrs. Pena before trial, but by that time, they had changed their stories

from their original statements and were minimizing what Petitioner told them on September 25.  (Tr.

VII, 66-67, 78.)  DeVries testified that they did not send the samples taken from Petitioner for DNA

testing because he already had confessed to the crime and there were other items that they believed

would be more valuable to the investigation. (Tr. VII, 71.)  According to DeVries, there's a limit of

seven items that can be sent for DNA testing.  (Tr. VII, 72-73.)  DeVries testified that the first time

he heard the theory that some other unknown person raped and murdered the victim was at the trial.

(Tr. VII, 84.)

      Dr. David Alan Start conducted an autopsy on the victim on September 26, 2005.  (Tr.

VII, 89.)  When the victim's body was received, she had a shirt tied tightly around her neck in a

simple overhand knot.  (Tr. VII, 89.)  It appeared that the shirt had been separated from the body,

made into a long ligature, and then wrapped and tied around the victim's neck.  (Tr. VII, 105.)  She

also was wearing a denim skirt and some articles of jewelry.  She was not wearing a bra or panties.

(Tr. VII, 89-90.)  Once the clothing and jewelry were removed and the trace evidence collected, the

body was cleaned for further external examination.  (Tr. VII, 91-92.)  Dr. Start collected evidence

for a rape kit. (Tr. VII, 91.) There was blood around the vaginal area. (Tr. VII, 92.) Dr Start observed a number of external injuries, including numerous bruises on the arms and legs. Dr. Start testified that the victim also had lacerations in the front and back sides of the vagina near the external opening; some of the lacerations measured up to 1/2 inch. (Tr. VII, 93.) She also had a laceration with a contusion on the portion of the anus closest to the vagina. (Tr. VII, 94.) In addition, Dr. Start observed broad contusions of the sidewalls of the vagina. (Tr. VII, 94.) Dr. Start opined that the pelvic injuries sustained by the victim were consistent with forceful penetration by a body part or foreign object. (Tr. VII, 94-95, 126-28.) According to Dr. Start, the victim would bleed from those injuries even if they were inflicted up to an hour or two after death. (Tr. VII, 120.)

With regard to internal injuries, Dr. Start observed bruising on both sides of the scalp. He also found injuries to the victim's neck, a hemorrhage to the right side of the tongue and petechial hemorrhages in both eyes that were consistent with strangulation. (Tr. VII, 97, 113.) Dr. Start concluded that the cause of death was strangulation. (Tr. VII, 98.) In this case, Dr. Start found injuries consistent with both manual strangulation and ligature strangulation. (*Id.*) The victim had a ligature wrapped tightly around her neck and had linear abrasions on her neck that were consistent with folded fabric. (Tr. VIII, 53, 92.) She also had bruises under her chin and internal hemorrhaging in the neck muscles, which was consistent with manual strangulation. (Tr. VIII, 51-52, 93.) Dr. Start testified that when a significant amount of pressure is used, as it appeared in this case, the person would lose consciousness after about 20 seconds. (Tr. VIII, 51.) After that, the pressure would have to be maintained for a minimum of three to five minutes in order for death to result from lack of oxygen to the brain. (Tr. VIII, 51-52.)

Dr. Start testified that the toxicology results showed a blood alcohol level of .08, as well as the presence of tobacco products, caffeine and cocaine. (Tr. VII, 118-19.) Cocaine can be associated with agitated delerium, where a person is in a very hyperactive state, physically and metabolically. (Tr. VII, 123.) Because the heart rate is elevated, there in an increased chance of death. (*Id.*) Dr. Start could not determine the time of death. (Tr. VII, 120.) Dr. Start also observed photographs of the marks on Petitioner's shoulders. (Tr. VII., 133.) He believed the marks were consistent with being caused by a mouth, but could not conclusively determine whether they were hickeys or bites. If they were bites, they were not hard enough to break the skin. (Tr. VII, 133-34.).

On the morning of the eighth day of trial, defense counsel moved for a *Walker* hearing as a result of newly discovered evidence that Petitioner's confession was coerced by promises of leniency by police officers. (Tr. VIII, 3-4.) In support of her motion, counsel pointed to a transcript of Petitioner's first phone call to his mother from jail following his arrest. According to counsel, references were made during the call to promises that were made to Petitioner and his family if Petitioner made a full confession. (Tr. VIII, 3.) Counsel further requested a mistrial if the Court found that the confession was the result of coercion. (Tr. VIII, 4.) In response to counsel's motion, the trial court conducted a *Walker* hearing outside the jury's presence. At the conclusion of the hearing, the trial court denied defense counsel's motion for a mistrial, finding it "completely implausible and almost ridiculous" that Sergeant McGee would have made a promise of leniency to induce Petitioner's confession. (Tr. VIII, 34-37.) The prosecutor subsequently moved for admission of the telephone calls made by Petitioner to his mother's house, which was granted by the trial court. (Tr. VIII, 38-45.)

After the trial was reconvened, the prosecutor called Detective Jorgensen to testify regarding phone call monitoring at the jail. Jorgensen testified that all phone calls made by prisoners are recorded. (Tr. VIII, 55.) Notices are posted at the jail to alert prisoners that their calls may be recorded. (Tr. VIII, 55-56.) The phone records showed that Petitioner made eight phone calls to his mother's phone number between September 26, the day of his arrest, and September 28. (Tr. VIII, 56-57.) Jorgensen attempted to listen to the calls, but could not understand them because the participants were speaking Spanish. (Tr. VIII, 57-58.)

Tamara Brubaker, a professional interpreter, testified that she listened to the phone conversations and translated the first phone call. (Tr. VIII, 62.) Brubaker read the complete transcript into the trial record. (Tr. VIII, 64-75.) The transcript included the following inculpatory statements by Petitioner:

| Voice 3: | The good thing that you also did was that you turned yourself in. When you realized it, you turned yourself in because you are sure you did it? Pause. Eh? |
|---|---|
| Voice 1: | Yes, mom. |
| Voice 3: | Are you quite sure you, Jo, Jocinto? |
| Voice 1: | Yes. Yes, I did it. |

***

| Voice 3: | When you go, when you are sentenced, this or that, tell them also the same thing, that you were under the influence of drugs. I don't know. They accused me of this and that, [and] that's all. Don't ever tell the truth. |
|---|---|
| Voice 1: | I already -- I already told them everything anyway. |
| Voice 3: | Eh? |

| Voice 1: | I already told them what I did. |
|---|---|
| Voice 3: | My -- but here, it's not bad, my dear son. |
| Voice 1: | I told them what I did, and what -- I wasn't thinking well.  I was drugged.  nothing of what I was doing was sinking in 'til I woke up.  I don't remember going to bed or anything.  And when I woke up, it sank in.  It hit me.  I saw her clothes, and I realized what I had done. |

(Tr. VIII, 69, 73-74.)  Brubaker did not make translated transcripts of the remaining phone calls, but was asked by the prosecutor and defense counsel to listen to the rest of the calls and take note of admissions or denials by Petitioner and any discussion by Petitioner regarding whether someone else was at his house.  (Tr. VIII, 75-76.)  According to Brubaker, Petitioner never denied committing the charged offenses during any of the phone conversation, nor did Petitioner ever claim that someone else committed the offenses.  (Tr. VIII, 76.)

Petitioner made additional inculpatory statements during the second phone conversation.  (Tr. VIII, 76.)  The following exchange took place between Petitioner and Vale, the person speaking to Petitioner on his mother's phone line:

| Petitioner: | I already talked to the police.  I already told them a lot.  Parts.  Things I remember. |
|---|---|
| Vale: | Yes. |
| Petitioner: | I told them how I strangled her. |
| Vale: | But it was you[?] |
| Petitioner: | Yes. |
| Vale: | Are you sure?  Are you sure? |
| Petitioner: | Sure.  I swear by the mother, but I was fucked up anyway. |

(Tr. VIII, 77.)  In another call, someone suggested to Petitioner that someone else was in the house, but Petitioner responded that the door was locked and nobody else was in the house.  (Tr. VIII, 77-78.)

Defense counsel moved for a directed verdict on the charge of first-degree murder on the ground that there was no evidence of premeditation.  (Tr. VIII, 82-83.)  Defense counsel also moved for a directed verdict on the charge of first-degree CSC, arguing that there was insufficient evidence that Petitioner had sex with the victim.  (Tr. VIII, 91-92.)  The trial court denied the motions.  (Tr. VIII, 86-90, 95-99.)

At the conclusion of trial, on October 19, 2006, the jury found Petitioner guilty of first-degree CSC, first-degree felony murder predicated on the commission or attempted commission of first-degree CSC, first-degree premeditated murder, and mutilating or defacing a dead body.  (Tr. IX, 101-102.)  On December 5, 2006, the trial court sentenced defendant as an habitual offender, second offense, MICH. COMP. LAWS § 769.10, to life imprisonment for his murder convictions, 20 to 60 years' imprisonment for the first-degree CSC conviction, and 5 to 15 years' imprisonment for the mutilation conviction.  (Sentencing Transcript, (S. Tr.), 8-9, docket #25.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on July 11, 2007, raised his first three grounds for habeas corpus relief, as well as a fourth claim asserting a violation of the Double Jeopardy Clause.  (*See* Def.-Appellant's Br. on Appeal, docket #26.)   By unpublished opinion issued on March 13, 2008, the Michigan Court of Appeals affirmed in part, vacated in part and remanded to the trial court for further proceedings.  (*See* 3/13/08 Mich. Ct. App. Opinion (MCOA Op.), docket #26.) With regard to Plaintiff's double

jeopardy claim, the court held that "[w]hen a defendant is convicted and sentenced for both felony murder and the underlying predicate felony, the underlying felony conviction and sentence must be vacated." (MCOA Op. 5.) Accordingly, the Court vacated Plaintiff's first-degree CSC conviction. The court of appeals further held that Petitioner's separate convictions and sentences for first-degree premeditated murder and first-degree felony murder arising from the death of one victim were improper. As a result, the case was remanded to the trial court for modification of the judgment of sentence to reflect a single conviction and sentence of first-degree murder, supported by two different theories. (*Id*.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised his first three grounds for habeas corpus relief. By order entered July 29, 2008, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #27.)

### C.      Post-conviction relief

On May 22, 2009, Petitioner filed a motion for relief from judgment raising claims of ineffective assistance of trial and appellate counsel that now are his fourth and fifth grounds for habeas corpus relief. The trial court entered an order on June 18, 2009, denying Petitioner's motion on the merits. (*See* 6/18/09 Kent County Circuit Ct. Ord., docket #32.) The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal on May 21, 2010 and March 8, 2011, respectively, for failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D). (*See* 5/21/10 Mich. Ct. App. Ord., docket #28; Mich. Ord., docket #29.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1089, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that

- 24 -

the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

### Discussion

### I.      **Sufficiency of the Evidence: Grounds I and II**

In his first ground for habeas corpus relief, Petitioner contends that there was insufficient evidence to support his conviction for first-degree felony murder. Specifically, Petitioner claims that the prosecutor failed to present sufficient evidence that he possessed the required state of mind, i.e., malice, and that the victim was raped and killed during an unbroken chain of events. Petitioner also contends that there is insufficient evidence that he committed the underlying felony of first-degree criminal sexual conduct. In his second ground for habeas corpus relief, Petitioner asserts that the evidence to support his conviction for mutilation of a dead body was insufficient because the prosecutor's theory that Petitioner inserted his fist into the victim's vagina, did not constitute "mutilation" under the statute.

The Michigan Court of Appeals rejected Petitioner's claims of insufficient evidence, stating:

> Defendant argues that the evidence of malice was insufficient to support the felony murder conviction, and that the evidence was insufficient within the meaning of the criminal statute to support a finding that he mutilated the victim's dead body. We review an argument challenging the sufficiency of the evidence to determine whether, "[t]aking the evidence in a light most favorable to the prosecution, . . . a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 420-421; 646 NW2d 158 (2002).

> The elements of felony-murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable

result [i.e. malice], (3) while committing, attempting to commit, or assisting in the commission of any" specifically enumerated felony, here first-degree criminal sexual conduct. *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007). A defendant's intent to commit the predicate felony does not per se establish that he had the requisite malice to support a felony-murder conviction; rather, malice must be specifically proved. *People v Wilder*, 411 Mich 328, 339; 308 NW2d 112 (1981), citing *People v Aaron*, 409 Mich 672, 727-729; 299 NW2d 304 (1980). Malice is the "intent to kill, intent to do great bodily harm, or wanton and willful disregard of the likelihood that the natural tendency of a person's behavior is to cause death or great bodily harm." *Aaron, supra* at 728-729. Malice is also described as "an intent to create a risk of great bodily harm with knowledge that such is the probable result." *People v Neal*, 201 Mich App 650, 654; 506 NW2d 618 (1993). The facts and circumstances of a killing may lead to an inference of malice, and "[i]t is for the jury to determine whether the element of malice can be inferred from all the evidence." *People v Flowers*, 191 Mich App 169, 176-177; 477 NW2d 473 (1991). Evidence of manual strangulation may be used to show that a defendant had the opportunity to consider his actions before he committed them. *See People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999). "[I]t is not a defense to any crime that defendant was, at that time, under the influence of or impaired by a voluntarily and knowingly consumed alcoholic liquor, drug, including a controlled substance, other substance or compound, or combination of alcoholic liquor, drug, or other substance or compound." MCL 768.37(1).

Here, evidence was presented at trial that defendant admitted to his mother, his girlfriend, and several police officers that he raped the victim and subsequently strangled her. A forensic pathologist testified that after 20 seconds of strangulation, a person can lose consciousness, but it takes several minutes before the oxygen in the brain is sufficiently depleted to cause death. If defendant's intent was merely to silence the victim or keep her from kicking out any more windows, he could have stopped strangling her as soon as she lost consciousness. But evidence was presented that defendant strangled the victim for several minutes before she died. Moreover, at some point during the strangulation, defendant released his hands from the victim's neck in order to tie her shirt tightly around her neck to complete the strangulation. Considering this evidence in a light most favorable to the prosecution, a reasonable jury could have concluded beyond a reasonable doubt that defendant had the intent to kill, the intent to cause great bodily harm, or the intent to cause a risk of great bodily harm with knowledge that such was the probable result. Defendant's claimed intoxication during these events is not a defense. MCL 768.37(1). Sufficient evidence of malice was presented to support defendant's felony murder conviction.[1]

With respect to defendant's mutilation conviction, the mutilation of a dead body is prohibited by statute, as follows:

A person, not being lawfully authorized to do so, who shall . . . mutilate, deface, remove, or carry away a portion of the dead body of a person, whether in his charge for burial or otherwise, whenever the mutilation, defacement, removal, or carrying away is not necessary in any proper operation in embalming the body or for the purpose of a postmortem examination . . . shall be guilty of a felony. . . [MCL 750.160.]

While this statute has not been construed by this Court or our Supreme Court, the Legislature is presumed to have intended the meaning it has plainly expressed. *People v Petty*, 469 Mich 108, 114; 665 NW2d 443 (2003). If the wording or language of a statute is unambiguous, no judicial construction is required or permitted and the statute must be enforced as written. *Id.*; *People v Williams*, 268 Mich App 416, 425; 707 NW2d 624 (2005). Unless the words have been defined in the statutes, they are to be given their plain and ordinary meanings, considering the context in which the words are used. *People v Thompson*, 477 Mich 146, 151; 730 NW2d 708 (2007); MCL 8.3a. If the Legislative intent is not apparent from the statute itself, this Court may consult dictionary definitions. *People v Peals*, 476 Mich 636, 641; 720 NW2d 196 (2006).

Black's Law Dictionary (8th ed) defines "mutilation" as the "act of cutting off or permanently damaging a body part." To "mutilate" is otherwise defined as "to injure or disfigure by removing or irreparably damaging parts." Random House Webster's College Dictionary (2001). To "deface" means "to mar the surface or appearance of; disfigure." *Random House Webster's College Dictionary* (2001). To "remove" means "to move or shift from a place or position." *Random House Webster's College Dictionary* (2001). Thus, according to the plain language[2] of the statute, a person may not cause irreparable or permanent damage or injury to, change the appearance of, or remove a portion of, the dead body.

The record reveals that defendant shoved his fist into the victim's vagina after he moved her dead body from his bedroom to the bathroom. The victim had large lacerations, tears, and bruises that were consistent with a fist or some other human or foreign object being inserted into the victim's vagina. Considering these facts together and in a light most favorable to the prosecution, the jury could have concluded beyond a reasonable doubt that defendant irreparably damaged and disfigured the victim's vagina when he shoved his fist inside her after she died.

[1] In reaching our conclusion, we decline to consider defendant's assertion that a lack of nexus between the murder and the predicate felony indicates that there was not sufficient evidence of his malice to sustain a felony murder conviction. Defendant does not support his contention with the use of authority or any reasoning or explanation. *People v Kevorkian*, 248 Mich App 373,389; 639 NW2d 291 (2001).

Because the plain language of the statute is clear and unambiguous, we decline to adopt defendant's more restrictive definition of mutilation for which he finds support in this Court's cases related to the common-law tort for mutilation of a dead body. *See Dampier v Wayne Co*, 233 Mich App 714, 729; 592 NW2d 809 (1999) (defining mutilation as the "active incision, evisceration, or dismemberment of a dead body"). We are not persuaded that this tort definition has become a technical, common-law definition, which should affect our analysis of the criminal statute. We note that other defendants have been criminally convicted of this crime where they burned a dead body. *People v Williams*, 265 Mich App 68, 70; 692 NW2d 722 (2005). Burning does not involve cutting, eviscerating, or dismembering a body.

(MCOA Op. 1-3.)

A. *First-Degree Felony Murder*

As an initial matter, it appears that the Court could decline substantive review of Petitioner's claim under the "concurrent sentencing doctrine." This doctrine invests the court with discretion to decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction. *See United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992); *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989). The doctrine has it's origins in appellate practice applicable to direct review of criminal cases. *See Benton v. Maryland*, 395 U.S. 784, 788-91 (1969); *Hirabayashi v. United States*, 320 U.S. 81 (1943). In these cases, the Supreme Court and the Sixth Circuit have declined to review convictions on one count where the presence of a valid concurrent count is sufficient to retain the defendant in custody. *See*, *e.g.*, *Hirabayashi*, 320 U.S. at 105; *United States v. Burkhart*, 529 F.2d 168, 169 (6th Cir. 1976). The standard guiding the court's discretion is whether there is any possibility of an adverse "collateral consequence" if the conviction is allowed to stand. *See Hughes*, 964 F.2d at 541; *Dale*, 878 F.2d at 935 n.3; *see also United States v. Byrd*, No. 89-6448, 1990 WL 116538 at * 3 (6th Cir. Aug. 13, 1990).

- 28 -

Although the doctrine has its roots in direct appeals, the federal courts routinely apply it in habeas corpus actions, citing the futility of reviewing a conviction that will not result in a petitioner's release from custody. *See*, *e.g.*, *Cranmer v. Chapleau*, No. 95-6508, 1996 WL 465025 (6th Cir. Aug. 13, 1996); *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991); *Williams v. Maggio*, 714 F.2d 554 (5th Cir. 1983); *VanGeldern v. Field*, 498 F.2d 400, 403 (9th Cir. 1974). In habeas actions, as in direct review, the exercise of the court's discretion depends upon the degree of prejudice that may be attributed to the challenged conviction and, specifically, the effect of any adverse collateral consequence if the conviction is allowed to stand. *Williams*, 714 F.2d at 555.

The present case appears to be an appropriate instance for application of the concurrent sentencing doctrine. At trial, Petitioner was convicted of both first-degree felony murder and first-degree premeditated murder. On appeal, the Michigan Court of Appeals held that Petitioner could not have two separate murder convictions from the death of one person, but ordered the trial court to modify the judgment of sentence to reflect a single conviction and sentence of first-degree murder, supported by two different theories. The present petition challenges only the felony-murder theory. Petitioner does not directly challenge his first-degree murder conviction under the premeditation theory. Thus, even if the court were to vacate the first-degree felony murder conviction, Petitioner's conviction and life sentence for first-degree premeditated murder would remain intact. Accordingly, the relief sought by petitioner, release from prison, would not be available even if the felony-murder conviction challenged in this petition were vacated.

Even if the concurrent sentencing doctrine does not apply in this case, Petitioner is not entitled to habeas corpus relief. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary

to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). And because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

As set forth in detail by the Michigan Court of Appeals, there was sufficient evidence that Petitioner acted with malice when he killed the victim. In this case, Petitioner told Detectives that he choked the victim with his hands and then took her shirt, wrapped it around her neck, and continued to choke her with the shirt. (Police Interview, 15, docket #30.) The physical evidence was consistent with Petitioner's account. The pathologist, Dr. Start, testified that the cause of the victim's death was strangulation. (Tr. VII, 98.) He found injuries consistent with both manual

strangulation and ligature strangulation. (Tr. VII, 98.) When the victim's body was received, she had a shirt tied tightly around her neck. (Tr. VII, 105.) When the shirt was removed, the victim had broad abrasions over the neck, consistent with having a ligature tied tightly around her neck. (Tr. VII, 92.) The victim also had bruises under her chin and internal hemorrhaging in the neck muscles, which were consistent with manual strangulation. (Tr. VIII, 51-52.) Dr. Start testified that when a significant amount of pressure is used, as it appeared in this case, the person would lose consciousness after about 20 seconds. (Tr. VIII, 51.) After that, the pressure would have to be maintained for a minimum of three to five minutes in order for death to result from lack of oxygen to the brain. (Tr. VIII, 51-52.)

The approximately three to five minutes during which Petitioner maintained pressure on the victim's neck after she lost consciousness was more than adequate time for Petitioner to take a second look, particularly when he discontinued the manual strangulation and began to strangle the victim with her shirt. *See People v. Johnson*, 597 N.E.2d 73, 79 (Mich. 1999) (evidence of manual strangulation may be used to show that a defendant acted with malice). Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Jackson*.

On direct appeal, Petitioner also asserted that a lack of nexus between the murder and the predicate felony indicated that there was not sufficient evidence of his malice to sustain a felony murder conviction. The Michigan Court of Appeals declined to consider that assertion because it was not supported by authority or any reasoning or explanation. (MCOA Op. 2 n.1) When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner

procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

Under Michigan law, a criminal defendant is required to provide legal authority and analysis in support of his questions presented on appeal. *See People v. Kevorkian*, 639 N.W.2d 291, 303 (Mich. Ct. App. 2001). In 1959, the Michigan Supreme Court held:

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. Failure to brief a question on appeal is tantamount to abandoning it.

*Mitcham v. Detroit*, 94 N.W.2d 388, 399 (Mich. 1959). Because the Michigan Court applied this long-standing rule to reject Petitioner's claim on appeal, the claim is procedurally defaulted.

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547

U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner does not argue cause or prejudice for his default, nor does he make a claim of actual innocence based upon new reliable evidence. Accordingly, his claim is barred from review by this Court.

In his habeas petition, Petitioner also contends that there is insufficient evidence that he committed the underlying felony of first-degree criminal sexual conduct. Petitioner did not directly raise this theory on appeal in the Michigan appellate courts, nor did he raise it in his motion for relief from judgment. An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented. 28 U.S.C. § 2254(c). Under Michigan law, a prisoner may file only one motion for relief from judgment with regard to criminal conviction. M.C.R. 6.502(G)(1). Because Petitioner already has filed a motion for relief from judgment, he has no available state-court remedy by which to exhaust his claim. "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred." *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman*, 501 U.S. at 752-53), *rev'd on other grounds*, 535 U.S. 635 (2002).

In light of his default, Petitioner must demonstrate cause and prejudice for his default or that a lack of federal habeas review of the claim will result in a fundamental miscarriage of

justice. *See House*, 547 U.S. at 536. Petitioner does not argue cause and prejudice for his default, nor does he make a claim of actual innocence based upon new reliable evidence. Consequently, Petitioner's claim may not be reviewed by the Court.

B. *Mutilation of a Dead Body*

At the outset, the Michigan Court of Appeals' definition of the term "mutilate" for purposes of MICH. COMP. LAWS § 750.160 is not subject to challenge on habeas corpus review. While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also, Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[w]hich acts constitute the elements of a state crime is a question generally answerable only by the state legislature and state courts." *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) (citing *Mullaney*, 421 U.S. at 691 ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law . . . .")). "'What is essential to establish an element, like the question whether a given element is necessary, is a question of state law.'" *Sanford v. Yukins*, 288 F.3d 855, 861 (6th Cir. 2002) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 103 (7th Cir. 1991)). As the Second Circuit explained, "*Winship*[4] does not invite federal habeas courts to engage in a substantive analysis of state statutory terms. Our federal constitution does not dictate to the state courts precisely how to interpret their own criminal statutes." *Id.*

---

[4]*In re Winship*, 397 U.S. 358 (1970).

The Michigan Court of Appeals held that, under the plain language of statute, "a person may not cause irreparable or permanent damage or injury to, change the appearance of, or remove a portion of, the dead body." (MCOA Op. 3.) Petitioner told police that after the victim was dead, he carried her to the bathroom and shoved his hand into her "pussy." (Police Interview, 6, 10.) The physical evidence was consistent with Petitioner's statement to police. Dr. Start testified that the victim had lacerations in the front and back sides of the vagina near the external opening; some of the lacerations measured up to half an inch. (Tr. VII, 93.) She also had a laceration with a contusion on the portion of the anus closest to the vagina. (Tr. VII, 94.) In addition, Dr. Start observed broad contusions of the sidewalls of the vagina. (Tr. VII, 94.) Dr. Start opined that the pelvic injuries sustained by the victim were consistent with forceful penetration by a body part or foreign object (Tr. VII, 94-95, 126-28). According to Dr. Start, the victim would have bled from those injuries even if they were inflicted up to an hour or two after death. (Tr. VII, 120.) In light of the record, it was not unreasonable for the Michigan Court of Appeals to conclude that Petitioner caused irreparable or permanent damage and disfigured the victim's vagina. Petitioner, therefore, is not entitled to habeas corpus relief on his claims of insufficient evidence.

II.    **Admissibility of Petitioner's Statements to Police: Ground 3**

In his third ground for habeas corpus relief, Petitioner contends that his statements to police were coerced by a promise of leniency by Sergeant McGee. Petitioner further claims that his statements to Officer Zabriskie and his recorded statements to Detectives Jorgensen and DeVries should be suppressed because they were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

On the eighth day of trial, defense counsel moved for a *Walker* hearing as a result of newly discovered evidence that Petitioner's confession was coerced by promises of leniency by police officers. (Tr. VIII, 3-4.) The newly discovered evidence was a recording of a phone call from Petitioner to his mother's residence following his arrest. Defense counsel moved for suppression of Petitioner's taped interview with Detectives Jorgensen and DeVries and a mistrial if the Court found that the confession was the result of coercion. (Tr. VIII, 4, 31.) Petitioner's mother, Maria Pena, Petitioner and Detective Jorgensen were called to testify at the *Walker* hearing.

Mrs. Pena testified that on the day of Petitioner's arrest, an officer promised her "that he would do all the [sic] possible to help Jacinto." (Tr. VIII, 7-8.) When Mrs. Pena saw Petitioner in jail, he told her that "they have made promises to him that he will get out, that he should say everything in detail." (Tr. VIII, 8, 10.)

Petitioner testified that before his interview with Detectives Jorgensen and DeVries, Sergeant McGee told him that he had talked to Petitioner's mother and told her that he would do everything possible for Petitioner. (Tr. VIII, 14-15.) McGee further stated to Petitioner, "Just tell me you did it. I'll make sure you don't get much time." (Tr. VIII, 15, 18-19.) Petitioner construed the officer's statement as a promise that Petitioner would not get a life sentence. (Tr. VIII, 18.) Petitioner admitted to calling his mother's house five times during the first night of his incarceration. (Tr. VIII, 16.) During those calls, Petitioner could not recall saying anything about promises made to him in exchange for his confession. (Tr. VIII, 16.) When Petitioner's mother mentioned the detective's comment that he would do everything possible to help Petitioner, he admitted to responding, "I don't know, not yet." (Tr. VIII, 16-17.) During his phone conversations that night, Petitioner's family members suggested that Petitioner tell the police that someone else did it, but

Petitioner responded, "I did it." (Tr. VIII, 21.) Nevertheless, Petitioner testified that he lied to police when he made his confession because he wanted to get the promised leniency. (Tr. VIII, 25-26.)

Detective Jorgensen testified that the *Walker* hearing was the first time he had heard of Plaintiff's allegation regarding a promise of leniency made by Sergeant McGee. (Tr. VIII, 27.) Jorgensen was not aware of any promise made by McGee or any other officer, nor had Plaintiff ever mentioned receiving a promise of leniency from any officer. (Tr. VIII, 27-28.) Sergeant McGee was unavailable to testify at the *Walker* hearing, but when asked by defense counsel earlier in the trial if he had promised anything to Petitioner, McGee testified that he had never talked to Petitioner in connection with the case. (Tr. VIII, 31; Tr VI, 111.)

At the conclusion of the hearing, the trial court denied the motion, finding it "completely implausible and almost ridiculous" that Sergeant McGee would have made a promise of leniency to induce Petitioner's confession. (Tr. VIII, 34-37.) The court continued:

> Here, at the time the defendant and his family presented themselves at the police headquarters, the police didn't even know that a crime had been committed, and the defendant virtually insists upon spilling forth with a confession to having, in the words attributed to him by Mr. Zabriskie, "murdered somebody."
>
> So the whole idea that the defendant's statement was somehow the product of coercive techniques, particularly inducements by way of promises, is at odds with the physical facts as we know them to be. The defendant had come down under his own power and voluntarily admitted to the commission of a crime, of which the police, up to that point, had no knowledge whatsoever.

(Tr. VIII, 35.)

The Michigan Court of Appeals first noted that the only issue raised at the *Walker* hearing was whether Petitioner's confession was coerced by promises of leniency. Consequently, that was the only issue concerning Petitioner's statements to police that was properly preserved for

appeal.  (MCOA Op. 4.)  The court of appeals concluded that Petitioner's confession was not

coerced by promises of leniency, stating:

> Defendant next argues that his confessions were coerced and not voluntary under the totality of the circumstances, including a failure to *Mirandize*[3] him. The only issue considered during the *Walker*[4] hearing below was whether defendant's confession was coerced by promises of leniency.  Therefore, that is the only question preserved for appeal.  We review a trial court's ultimate decision on a motion to suppress evidence de novo. *People v Akins*, 259 Mich App 545, 563; 675 NW2d 863 (2003).  However, we will not disturb a trial court's factual findings with respect to a *Walker* hearing unless those findings are clearly erroneous. *Id*. A finding is clearly erroneous where we are left with a definite and firm conviction that a mistake has been made. *Id*. With respect to defendant's unpreserved allegations of error related to the admission of his statements to police, he may obtain a reversal of his conviction where the error was plain and affected his substantial rights. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003).

> A defendant's confession must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence . . . .'" *People v Daoud*, 462 Mich 621, 632; 614 NW2d 152 (2000). Whether defendant was promised leniency is determined from the defendant's point of view by considering "whether defendant is likely to have reasonably understood the statements in question to be promises of leniency." *People v Conte*, 421 Mich 704, 739-740; 365 NW2d 648 (1984). Furthermore, to make a defendant's confession involuntary, the promise of leniency has to be one "relied upon by the defendant in making his decision and one that at least in part prompted the defendant to confess." *Id*. at 741.

> Whether a defendant's confession was otherwise voluntary is determined by examining the conduct of the police. *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003). "The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id*. at 374. Several factors should be considered, including:

> > the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged or in ill health when he gave the statement; whether the

accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*. at 373-374.]

Each factor should be considered, and none of the factors is determinative. *Id*. at 374. Where defendant is in custody during interrogation, he must "voluntarily, knowingly, and intelligently" waive his Fifth Amendment rights to remain silent and to an attorney before any of his statements obtained during the custodial interrogation can be used against him. *Akins, supra* at 564. A person is in custody where the "person has been formally arrested or subjected to a restraint on freedom of movement or of the degree associated with a formal arrest." *People v Peerenboom*, 224 Mich App 195, 197; 568 NW2d 153 (1997). Once a defendant is in custody and has been instructed about his rights, the police are not required to reread his rights every time they question him. *People v Littlejohn*, 197 Mich App 220, 223; 495 NW2d 171 (1992).

Here, after a de novo review of the entire record, we are not left with a definite and firm conviction that the trial court made a mistake when it found that defendant's claims that he was promised leniency were fabricated and otherwise unsupported by the objective evidence available on the record. There was no objective evidence on the record that Detective McGee ever talked to defendant, let alone had the time to promise defendant leniency in exchange for his confession. Defendant was escorted from the lobby of the police department to the interview room by Officer Zabriskie. Officer Zabriskie did not leave until Detectives Jorgensen and DeVries arrived to question defendant. Furthermore, we will not disrupt on appeal the trial court's determination that defendant's story was not credible. *People v Noble*, 238 Mich App 647, 657; 608 NW2d 123 (1999).

Furthermore, we do not believe that any plain error exists with respect to the voluntariness of defendant's confessions. Both confessions were made without substantial questioning from police officers. Defendant came, with his family, to the police station before the police were aware that a crime had been committed, and stated that he had "murdered someone." Defendant was instructed of his Fifth Amendment rights as soon as Officer Zabriskie understood that defendant intended to confess to a murder. During defendant's subsequent recorded statement, he admitted he was already informed of his rights, and then signed a waiver of those rights. The five-minute delay during the recorded interview, before defendant was reinstructed of his rights, does not automatically make his confessions involuntary because defendant had been previously advised of his *Miranda* rights. *Littlejohn, supra* at 223. Furthermore, although defendant admitted to drinking and taking cocaine during the previous night, defendant did not appear drunk during his statements, his speech was not slurred, and he was able to stand. Finally, defendant was not in custody for long before making his statements. There was no evidence that

he was deprived of food, water, sleep, or medical attention, or that he was threatened or coerced in any manner. *See Shipley, supra*. Considering the totality of the circumstances, the trial court did not commit plain error when it admitted defendant's confessions into evidence.

[3]*Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[4]*People v Walker* (On Rehearing), 374 Mich 331; 132 NW2d 87 (1965).

(MCOA Op. 3-5.)

### A. Confession Coerced by Promise of Leniency

"The Fifth Amendment guarantees that 'no person . . . shall be compelled in a criminal case to be a witness against himself.'" *New York v. Quarles*, 467 U.S. 649, 654 (1984). The privilege against self-incrimination bars the admission of coerced or involuntary statements. *See United States v. Fowler*, 535 F.3d 408, 416 (6th Cir. 2008). "When considering whether a confession is voluntary, we look at 'the totality of the circumstances' to determine whether 'a defendant's will was overborne in a particular case.'" *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). Relevant factors include the defendant's age, his level of education and intelligence, whether he was warned of his constitutional rights, the length of the detention, the "repeated and prolonged nature of the questioning," and the use of physical punishment "such as the deprivation of food or sleep." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

"A confession is involuntary if the police engaged in objectively coercive activity, the coercive activity was sufficiently severe to overcome the defendant's will and the defendant's statements stemmed from the coercion." *Craft*, 495 F.3d at 263 (citing *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). A promise of leniency may render a confession coerced, depending on the totality of the circumstances. *U.S. v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011); *see also*

*United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992) (holding that "[a] promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary"). Nevertheless, such statements usually are permissible. *See Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991) (noting, "we have no doubt that effective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect"), *rev'd on other grounds*, 507 U.S. 680 (1993). In general, such promises are coercive only "if they are broken or illusory." *United States v. Johnson*, 351 F.3d 254, 262, n.1 (6th Cir. 2003) (defining an illusory promise as "a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action"); *see also Williams*, 944 F.2d at 289–90 (holding that confession was coerced because police told suspect that if he told the truth about his role in the murder, he would not be charged, but if he didn't talk, he would be charged with murder). Moreover, promises "to recommend leniency" or "speculation that cooperation will have a positive effect" do not make subsequent statements involuntary. *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005) (quoting *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).

      In this case, the trial court found that police officers made no promises to induce an incriminating statement from Petitioner. A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Although the voluntariness of a confession is a legal question that falls outside of the § 2254(e)(1) presumption, *Miller v. Fenton*, 474 U.S. 104, 115 (1985), subsidiary factual questions, including whether police engaged in coercive tactics, are entitled to the presumption of correctness. *Id.* at 112;

*Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Here, Petitioner fails to overcome the presumption that the trial court's determination was correct. There was nothing in the record to support Petitioner and his mother's testimony at the *Walker* hearing that a promise of leniency had been made to Petitioner. Officer Zabriskie was the first officer that Petitioner made contact with upon arriving at the police department. (Tr. III, 22-24.) Petitioner told Zabriskie that he was there to turn himself in because he had "murdered somebody." (Tr. III, 24.) Zabriskie escorted Petitioner from the lobby to an interview room where he stayed with Petitioner until Detectives DeVries and Jorgensen arrived to take Petitioner's statement. (Tr. III, 22-33.) Zabriskie testified that he never made any promises to Petitioner in exchange for his statements. (Tr. III, 34.) According to Zabriskie, "There was no reason to. He walked in, he volunteered, he brought himself to the police department to turn himself in. There's -- nothing like that happened. (Tr. III, 34-35.) Detective Jorgensen testified that neither he nor Detective DeVries promised to be lenient with Petitioner if he gave a statement. (Tr. III, 89.) The *Walker* hearing was the first time that Jorgensen heard Petitioner's allegations that his statements were induced by a promise of leniency. (Tr. VIII, 27.) Jorgensen did not see Sergeant McGee when he arrived at the interview room and testified that it would have been outside of the normal protocol for McGee to be in the interview room with Petitioner. (Tr. VIII, 30.) At the *Walker* hearing, Petitioner admitted that he did not mention any promises of leniency made by other officers during his interview with the detectives. (Tr. VIII, 24-25.) Sergeant McGee testified that he never talked to Petitioner. (Tr. VI,

111.) Consequently, there was no evidence corroborating Petitioner's testimony that Sergeant McGee ever talked to Petitioner, let alone made a promise of leniency.

Moreover, regardless of whether Sergeant McGee made the alleged promise to Petitioner, it clearly was not the motivating factor in Petitioner's decision to confess. Petitioner walked into the police station and began confessing to Officer Zabriskie before the police were even aware that a crime had occurred. Petitioner admitted to telling Zabriskie, "That I think I murdered a girl." (Tr. VIII, 17.) As soon as Officer Zabriskie realized that Petitioner was confessing to a murder, he informed Petitioner of his *Miranda* rights. (Tr. III, 26.) Petitioner waived his rights and willingly provided Zabriskie with details about the victim's murder. (Tr. VIII.) He also told Zabriskie that he raped the victim. (Tr. VIII, 36.) Petitioner testified that Sergeant McGee made the alleged promise of leniency after his statement to Officer Zabriskie, but before his statement to Detectives Jorgensen and DeVries. (Tr. VIII, 14-15.) Consequently, the only statement that can be challenged as a result of McGee's alleged promise was his statement to Detectives Jorgensen and DeVries. Detective Jorgensen re-advised Petitioner of his *Miranda* rights near the beginning of the interview. (Tr. III, 85.) The transcript of the interview, which lasted approximately one hour, shows that Petitioner willing provided detailed information about the victim's murder and answered questions without any pressure whatsoever from the detectives. (Tr. III, 95; Police Interview, docket #30.)

As discussed by the Michigan Court of Appeals, there are no other facts or circumstances that would tend to show that the coercion in question was sufficient to overbear his will. Petitioner was twenty-two years old at the time of the offense. Petitioner spoke to the detectives in English and did not appear to have any difficulty understanding English. (Tr. III, 87.)

Petitioner stated that he ingested large amounts of beer and cocaine the night before (Police Interview, 1, 4-5), but Officer Zabriskie testified that he did not appear drunk or high when he arrived at the police department around 7:15 p.m. on September 25. (Tr. III, 29-31, 54.) Zabriskie testified that Petitioner seemed embarrassed or sorrowful, but was able to communicate effectively. (Tr. III, 29.) Detective Jorgensen similarly described Petitioner's demeanor as calm and "kind of a bit depressed, " but Jorgensen did not see any signs or indications that Petitioner was under the influence of drugs or alcohol. (Tr. III, 87.) Officer Zabriskie first advised Petitioner of his rights. (Tr. III, 26-27.) During Plaintiff's recorded statement with the detectives, he confirmed that Officer Zabriskie already had advised him of his rights, and then signed a waiver card. (Police Interview, 2, docket #30.) Petitioner only was detained for a short time before his interview with the detectives and had not been deprived of food, water or sleep. The interview lasted only one hour and maintained a non-confrontational tone throughout. (Tr. III, 102.) Petitioner does not allege that detectives used any form of physical or mental coercion during the interview. Therefore, considering the totality of the circumstances, it was not unreasonable for the Michigan Court of Appeals to conclude that Petitioner's confession was voluntary.

B.    *Miranda* violation

Petitioner also asserts a *Miranda* violation. Because the *Miranda* issue was not raised at the *Walker* hearing, the Michigan Court of Appeals found the issue unpreserved for appeal. (MCOA Op. 3-4.) Under well-established Michigan law, an issue is not preserved for appeal unless it is properly raised in the trial court. *See Eriksen v. Fisher*, 421 N.W.2d 193, 198 (Mich. Ct. App. 1998). Further, even though the court of appeals applied a limited review of the claimed error to determine whether the error was plain and affected his substantial rights, Petitioner's failure to

preserve the issue is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003) (citing *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), and *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000)); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989). Petitioner, therefore, must demonstrate cause and prejudice or that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. Petitioner does not assert cause for his failure to raise his *Miranda* claim in the trial court. While Petitioner makes claims of ineffective assistance of counsel, he does not specifically claim that counsel was ineffective for failing to raise the alleged *Miranda* violation. Accordingly, Petitioner's claim is barred from review by the Court.

### IIII. Ineffective Assistance of Trial Counsel: Ground 4

In his fourth ground for habeas corpus relief, Petitioner contends that his Sixth Amendment rights were violated due to ineffective assistance of trial counsel. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130,

135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

Petitioner first claims that his trial counsel's deficient performance at the *Walker* hearing violated his Sixth Amendment rights. Specifically, Petitioner claims that counsel misled the court to Petitioner's detriment when she stated during the *Walker* hearing that Sergeant McGee previously testified at trial that he had not promised Petitioner anything, when, in fact, McGee had testified that he did not recall. Petitioner maintains that, without counsel's error, it was reasonably likely that the court would have ruled in favor of the defense or recalled Sergeant McGee, who may have remembered making a promise of leniency. Petitioner further argues that without his statement

to police, he likely would have been acquitted. Petitioner raised this claim for the first time in his motion for relief from judgment. Applying the *Strickland* standard, the trial court held that "the performance of trial counsel did not fall below an objective level of reasonableness nor did her representation so prejudice Defendant as to deprive him a fair trial." (Ord. Denying Motion for Relief from J., docket #32.)

Petitioner's argument ignores the fact that Sergeant McGee testified at trial that he never talked to Petitioner. Defense counsel posed the following questions to Sergeant McGee on cross-examination:

| Defense Counsel: | Did you ever talk to Mr. Pena? |
|---|---|
| Sgt. McGee: | No, I did not. |
| Defense Counsel: | You never promised him anything if he would go and talk to the officers that day? |
| Sgt. McGee: | I don't recall ever having talked to Mr. Pena. |

(Tr. VI, 111.) Sergeant McGee could not be called to testify at the *Walker* hearing because he was out of town. (Tr. VIII, 30.) Defense counsel then reminded the trial court that she had asked McGee "if he promised [Petitioner] leniency, and he said, 'No.'" (Tr. VIII, 31.) In light of McGee's previous testimony that he never talked to Petitioner, counsel's characterization of McGee's testimony at the *Walker* hearing clearly did not fall below an objective level of reasonableness. Moreover, it is highly improbable that recalling Sergeant McGee to the stand would have yielded a different response to the question.

Petitioner also contends that his counsel was ineffective for failing to challenge the credibility of his statements to police by arguing to the jury that the statements were a result of being

promised leniency. Petitioner has not overcome the presumption that Counsel's decision to move for a *Walker* hearing, rather than argue the issue to the jury, was a matter of trial strategy. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Moreover, disagreement over trial strategy is not a basis for ineffective assistance of counsel. *Strickland*, 466 U.S. at 689. Defense counsel elicited testimony from Mrs. Pena that an officer had made promises of leniency to her and Petitioner. (Tr. VIII, 8-10.) Defense counsel then attempted to elicit testimony from Sergeant McGee on cross-examination that he made a promise of leniency, but McGee denied ever talking to Petitioner. (Tr. VI, 111.) Petitioner elected not to testify at trial, so he was unable to offer direct testimony to the jury regarding the alleged promise of leniency. By moving for a *Walker* hearing, defense counsel could call Petitioner to testify before the trial court on the limited issue of Sergeant McGee's alleged promise of leniency. The fact that the trial Court disbelieved Petitioner's testimony and denied the motion to suppress does not render counsel ineffective. *See Hamilton v. Jackson*, 416 F. App'x 501, 508 (6th Cir. 2011) ("The fact that the strategy was not successful does not amount to ineffective assistance."). Consequently, the decision of the trial court was not an unreasonable application of *Strickland*.

Petitioner makes several additional claims of ineffective assistance of trial counsel which were not raised in his motion for relief from judgment. For example, Petitioner claims that defense counsel failed to investigate or to present a meaningful defense, and failed to call witnesses in support of his theory that he was not the only person at the house on the night of the murder. He further claims that defense counsel failed to answer letters and phone calls from him and his family.

As previously discussed, Petitioner has filed his one allotted motion for relief from judgment in the state courts. Because he does not have an available remedy in the state courts, his claims are considered exhausted, but are procedurally defaulted. *See Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013). Petitioner does not argue cause for his failure to raise these claim in his motion for relief from judgment. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Consequently, Petitioner's new claims of ineffective assistance of trial counsel are precluded from habeas review.

## IV. Ineffective Assistance of Appellate Counsel: Ground 5

Petitioner claims that his appellate counsel was ineffective for failing to raise the claims of ineffective assistance of trial counsel. In denying Petitioner's motion for relief from judgment, the trial court held that appellate counsel was not ineffective for failing to raise claims of ineffective assistance of trial counsel that the court found to be without merit. (Ord. Denying Motion for Relief from J., docket #32.)

The *Strickland* standard also applies to Petitioner's claims of ineffective assistance of appellate counsel. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it

is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.*

Petitioner cannot meet his burden.  This Court concluded that Petitioner was not entitled to habeas corpus relief on his claims of ineffective assistance of trial counsel.  Consequently, Petitioner cannot show that those claims clearly were stronger than the claims presented on direct appeal.  Accordingly, the decision of the trial court was not an unreasonable application of *Strickland*.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  August 12, 2013                    /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).